UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
In re:

    Timothy J. Shenk, Sr.,                                       Case No. 17-31377
                          Debtor                                            Chapter 7

---

    Timothy J. Shenk, Sr.                                Adv. Proc. No. 17-50016
                        Plaintiff,
    v.

    U.S. Department of Education, State of New York
    and State University of New York College at Cortland,

                        Defendants.

---

Appearances:

Timothy J. Shenk, Sr.                                                 *Appearing Pro Se*
3 Walnut Street
P.O. Box 548
Moravia, NY 13118


William F. Larkin, Esq.                                       *for Defendant U.S. Department of*
United States Attorney's Office                      *Education*
100 S. Clinton Street
Syracuse, NY 13261-7198


Louis Testa, Esq.                                                  *for Defendants State of New York*
Office of the New York Attorney General           *and State University of New York,*
The Capitol                                                     *College at Cortland*
Albany, NY 12224-0341


**Memorandum-Decision and Order**

      Timothy J. Shenk, Sr. ("Debtor") brought this adversary proceeding against U.S. Department of Education ("U.S. Dep't. Ed."), State of New York and State University of New York College at Cortland ("SUNY Cortland" and, together with State of New York, "State Defendants"). The initial complaint (Doc. 1) was procedurally defective and per court order,

Debtor filed an amended complaint ("Complaint").[1] Doc. 21. The Complaint stated four counts seeking declaratory and injunctive relief that: (i) Debtor's federal student loans be discharged, (ii) SUNY Cortland award Debtor his degree if such discharge is granted, (iii) Debtor's loans owed to the State of New York be discharged based on undue hardship, and (iv) Debtor's loans owed to the State of New York have been forgiven by SUNY Cortland. *Id.*

Following a pre-trial conference on October 16, 2018, at which Debtor consented to the dismissal of counts II and IV, the court entered an order reflecting the parties' agreement and dismissed counts II and IV. Doc. 51. Only counts I and III remain, in which Debtor seeks this court's determination that his student loans impose an undue hardship and are dischargeable pursuant to 11 U.S.C. § 523(a)(8).

Defendants answered the Complaint and asserted that Debtor failed to state a claim upon which relief could be granted and the student loans should not be dischargeable. Docs. 22, 23, 24.

For the reasons that follow, the court finds that Debtor's student loan obligations are non-dischargeable and shall dismiss the Complaint as to all Defendants.

## Jurisdiction

The court has jurisdiction to hear and enter a final judgment in this adversary proceeding pursuant to the provisions of 28 U.S.C. §§ 1334(b) and 157(b)(2)(I). Debtor has consented to the entry of final orders pursuant to Fed. R. Bankr. P. 7008. Doc. 21. This memorandum-decision and order incorporates the court's findings of fact and conclusions of law as permitted by Fed. R. Bankr. P. 7052.

---

[1] At the time this adversary proceeding was filed, Debtor was represented by Attorney Charles Andersen. Attorney Andersen subsequently requested to withdraw as counsel (Doc. 36), which the court granted (Doc. 81). Debtor proceeded to trial *pro se*.

## Factual Findings

The parties signed a pre-trial Joint Stipulation of Facts (Doc. 77) ("Joint Stip."). At trial, Debtor was the sole witness to offer testimony. Based upon the stipulated facts, Debtor's oral testimony and the exhibits admitted at trial,[2] the court makes the following findings.

### *Debtor's Student Loan Debt*

Debtor is currently 59 years old. His student loan debt owed to the State Defendants was reduced to judgment in the amount of $4,643.55, on February 24, 2004. D Ex. B. Debtor made no payments on the debt, either before or after the entry of judgment, and currently owes in excess of $10,000.

Separately, Debtor accumulated federal loans to pay for his educational expenses. He consolidated his federal loans in March 2003 by executing a promissory note, payable over 20 years at 4.35% interest per annum to U.S. Bank, N.A. The original loan was for $44,908.67 and an additional $14,800.51 was disbursed over the next two months. The loan was guaranteed by the Academic Learning Center and reinsured by U.S. Dep't. of Ed. Debtor never made any voluntary payments on the loan. He applied for and received four economic hardship deferment requests but ultimately defaulted on the loan on July 7, 2009. The Academic Learning Center paid

---

[2] Plaintiff's exhibits ("P Ex.") include: Pre-Trial Statement (Doc.80) (P Ex. A); Jefferson County Office of Child Support Enforcement Support Obligation Summary (P Ex. B); Article: "New York Teachers Are Highest paid in U.S.," (P Ex. C); Average NYS Teacher Pension (P Ex. D). Defendants' joint exhibits ("D Ex.") include: Stipulation of Settlement dated 11/6/03 between State of New York and Timothy Shenk (D Ex. A); Judgment obtained by State of New York against Timothy Shenk dated 2/24/04 (D Ex. B); Debtor's chapter 7 Petition and Schedules (D Ex. C); Complaint (D Ex. D); U.S. Dep't Ed. Certificate of Indebtedness dated 1/4/18 (D Ex E); Indemnification Agreements Assigning Federal Loans (D Ex. F); Consolidation Loan and Repayment Schedule (D Ex. G); Debtor's Economic Hardship Deferment Requests (D Ex. H); Garnishment Payment History (D Ex. I); Debtor's Social Security Earnings (D Ex. J); Debtor's Response to Interrogatories (D Ex. K); Debtor's Response to Document Request (D Ex. L); Jefferson County Office of Child Support Enforcement Support Obligation Summary (D Ex. M) (duplicate of P Ex. B); State Defendants' Answer to Complaint (D Ex. N); U.S. Dep't Ed.'s Answer to Complaint (D Ex. O); Debtor's Response to Requests for Admissions (D Ex. P).

out on its guarantee and pursued collection efforts against Debtor.[3] The Academic Learning Center was ultimately reimbursed by the U.S. Dep't. of Ed., which now holds the loan. As of January 2018, the outstanding balance owed by Debtor was $91,675.41, with $8.51 interest accruing daily.

*Debtor's Background Story*

Proceeding *pro se,* Debtor related his personal story at trial as to the origin of his student loan debt and why he believes the loans should be discharged.

Debtor graduated high school in 1978 and four years later—married by that time with two children—he enlisted in the infantry of the United States Army, 82nd Airborne division, where he served on active duty for thirteen years. During that time, he had two more children, divorced, and became liable for domestic support obligations to his ex-wife, who was awarded custody of their four children. Upon leaving active service, Debtor joined the New York Army National Guard in Cortland, with the intent to "finish up my twenty-year military career … so I wouldn't lose my thirteen years that I spent and become a teacher." Transcript of trial held on April 26, 2019 ("Doc. 87") ("Hr'g Tr.") p.9 at 5-7. Debtor had previously dabbled in community college and in 1995, following his retirement from active duty, Debtor enrolled at SUNY Cortland. Debtor received his Bachelor of Arts degree in English from SUNY Cortland in 1999. That same year, Debtor entered SUNY Cortland's two-year M.A.T. (Master's) Program in Adolescent Education. D Ex. A. Debtor earned 9 credits each semester in the fall of 1999, and in the spring and fall of 2000. Debtor enrolled for 9 additional credits in the spring of 2001 but withdrew for unknown reasons.

---

[3] Thirty-two separate payments were garnished from Debtor's paychecks from 2010 through 2014, crediting a total of $6,099.25 against the loan balance. D Ex. I.

4

Fall 2001 brought a series of events that led to Debtor's current predicament. Debtor enrolled to begin his required student teaching, but the fall semester coincided with the terrorist attacks on the World Trade Center in New York City. Debtor was called up by the National Guard and ordered to perform service at the site of the disaster for sixteen days. As a consequence, Debtor withdrew from school that semester.[4] He returned the following spring in 2002 and completed his student teaching. Having successfully completed the M.A.T. program requirements, Debtor was expecting to graduate that May. However, by that time, Debtor had defaulted on his loan obligations to SUNY Cortland. Debtor did not remedy the status of his loan obligations and never graduated. Debtor introduced a December 22, 2015 letter from Associate Dean Jerome O'Callaghan which reiterated SUNY Cortland's policy not to award degrees when student financial obligations are in default. P Ex. A. Dean O'Callaghan stated in his letter that he believed Debtor's failure to pay was "directly related to the fall 2001 semester when he left for 9/11 duty." *Id.* The letter explains that students have a maximum five-year timeframe within which they must complete all program degree requirements. *Id.* Since five years had elapsed from the time Debtor first undertook his course of study, no Master's degree would be issued to Debtor based on any of his earlier studies.

Debtor is embittered by his experience with the State of New York. Despite the odds, he ambitiously pursued a teaching degree, only to have SUNY Cortland withhold it. Debtor asserts that he is not a "slacker" and has shown his good faith by his service to his country. Hr'g Tr. p. 86 at 10. He asserts that New York State has blocked him from working "at a financially viable and well-paying job." P Ex. A ¶ 3. The bitter irony is that when ordered by the Governor, Debtor

---

[4] Although the record is not clear on this point, the court surmises that the interruption of Debtor's full-time status as a student–by his absence during spring semester of 2001, combined with his dropping fall semester 2001– triggered the onset of repayment obligations on his student loans.

assisted New York State at a time of dire need only later to have the State refuse to confer the degree that may have put him on a financial path to pay what was owed. Debtor may feel justifiable anger at how he has been treated in this matter, but Debtor admits that his anger is only with the State. With respect to his federal loans, Debtor admits, "the taxpayers should have been paid back; had I been allowed to exercise my teaching degree, they would have been." Hr'g Tr. p. 86 at 5-8.

Notwithstanding this history, Debtor laid out his goals for the future. He would "still like to get ahead in life." Hr'g Tr. p. 80 at 9. Debtor stated that he qualifies for free military flights and would like to travel in the future. Hr'g Tr. p. 80 at 6-7. He is intent upon paying the balance of a debt owed to Jefferson County so that he will be eligible to get a passport. The debt arises from past public assistance that had been provided to the mother of his four children.[6] Debtor is seeking a way that he "can still make a living and just have a decent house and a car, just basic American dream things." Hr'g Tr. p. 33 at 18-21. The court understands these goals. Debtor's requested ability to be free of debt to pursue these ambitions, however, must be analyzed in light of his financial circumstances and the standard set forth in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987).

***Debtor's Work and Financial History***

Since leaving the military, Debtor has worked at a series of blue-collar jobs. Hr'g Tr. p. 30 at 8-9. For years 2009 to 2014, Debtor was employed in various jobs, including one as a hoist operator at a salt mine where he testified that he made "decent money."[7] Hr'g Tr. p. 30 at 10-11. During these years Debtor made more than $44,000 in every year but one, Joint Stip. p. 5, with

---

[6] As of December 14, 2018, Debtor owed Jefferson County $11,142.26, having already paid down $85,647.65 of the original debt of $96,778.37. D Ex. B
[7] Debtor's other jobs included working as a groundskeeper and a health aide. D Ex. K.

earnings topping $53,395. D Ex. J. These comparatively high earnings ended in 2015, when Debtor left the salt mine with the plan to take over a nursing home run by his elderly mother. Hr'g Tr. p. 31 at 22-25. The enterprise did not go well. Debtor was only employed part-time by the nursing home and never formally managed the facility. Hr'g Tr. p. 32 at 5-8. The nursing home closed in 2017. Hr'g Tr. p. 32 at 8. As a result, since 2015, Debtor has made less than $15,000 each year. Joint Stip. p. 5. Most recently, until December 19, 2018, Debtor was making $450 per week as a manual laborer. On that date, Debtor injured his arms and thereafter collected one payment of $300 from worker's compensation. Hr'g Tr. p. 31 at 2-3.

Debtor testified that he withdrew $10,000 from his 401(k) retirement account in 2014 and spent the money, in part, to purchase a motorcycle and a guitar. Hr'g Tr. p. 56 at 14-25; p. 57 at 1-14. The motorcycle was an Enduro bike—a 2010 Yamaha TW200—that Debtor stated cost "a couple thousand dollars." Hr'g Tr. p. 58 at 1-3. Debtor also owns three accordions, which he may have purchased at this time, for approximately $925. Hr'g Tr. p. 65 at 14-18. He estimates that the accordions are valued at $1,600. *Id.*

***Debtor's Current Financial Picture***

Since December 2018, Debtor has been unemployed and at the time of trial collected New York State Unemployment Insurance in the amount of $450 per week. The court takes judicial notice of the fact that New York State pays a maximum of 26 weeks of unemployment. N.Y. Labor Law § 607 (McKinney 2013). This time period was exhausted by Debtor as of approximately June 18, 2019. Debtor receives $144 per month on account of a 10% Veterans Administration disability rating for tinnitus. He has self-published books on amazon.com and receives approximately $20 per month in royalties. D Ex. K. Debtor has no current dependents. He shares his household with his girlfriend and pays $1,000 in rent per month, exclusive of utilities.

7

He pays approximately $300 per month for phone and internet and $135 per week for food. Debtor pays $25 per month to Jefferson County and testified that his tax refunds since 1987 have been garnished and applied toward this debt. Hr'g Tr. p. 15 at 5-22. Debtor's girlfriend makes $356 per week at Kinney's Pharmacy. She contributes $100 per month to cover the utilities bill and allows Debtor to share her car.

*Debtor's Future Financial Picture*

Debtor's current financial picture will not remain fixed. The state of Debtor's finances may change in two ways. First, in March 2020 he will become entitled to a military pension of approximately $2,200 per month based on his twenty years of service. Hr'g Tr. p. 46 at 8-17. Soon after, at age 62, Debtor will become eligible for Social Security. 42 U.S.C. § 402; 20 C.F.R. § 404.409. Second, Debtor is continuing to seek gainful employment. He testified that he recently interviewed for the position of director of veterans' affairs for Cortland County for which he was not selected but has a pending interview for the same position in Tompkins County. The position pays $72,000 per year. Hr'g Tr. p. 33 at 9-12.[8] Debtor is able-bodied and ambitious. He continues to pursue well-paying jobs and in the view of this court, his persistence will result in gainful employment in the near future. His ability to obtain interviews in the area of veterans' affairs speaks to his long military service and the potential strength of his candidacy. At trial he testified that the week prior he had applied for his old job at the salt mine and that "they paid pretty good." Hr'g Tr. p. 31 at 18-21.

---

[8] The court notes that Debtor scheduled an additional $2,708 of unsecured claims. other than his student loan and domestic support obligations. These amounts have been discharged pursuant to the Order of Discharge entered on January 22, 2018. (Case No. 17-31377 Doc. 14).

## Legal Standard

Section 523(a)(8) of the Bankruptcy Code provides that a debt for "an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution" is nondischargeable, unless excepting such debt from discharge would "impose an undue hardship on the debtor and debtor's dependents." The Second Circuit's enunciated standard governing the dischargeability of student loans is found in *Brunner*, 831 F.2d at 395. *Brunner* sets forth three prongs that must be met to establish "undue hardship." *Id.* To hold a student loan nondischargeable, it must be shown:

"(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for [him]self and [his] dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans."

*Id.* at 396.

Some courts and commentators have questioned the continued application of *Brunner*.[9] The Second Circuit, however, continues to follow *Brunner* and has declined to revisit it.[10] Absent Congressional legislation that changes the standard for discharging student loans, *Brunner* remains binding precedent which this court must apply. Debtor must prove each *Brunner* prong by a

---

[9] *See generally, In re Turturo*, 522 B.R. 419, 426 n. 16 (Bankr. N.D.N.Y. 2014) (citing cases questioning *Brunner*); *see also* ABI Commission on Consumer Bankruptcy, Final Report of the ABI Commission on Consumer Bankruptcy 2017-2019 Final Report and Recommendations p. 11-13 Robert M. Lawless (2019) (recommending *inter alia* that courts deny discharge only where a debtor has actually acted in bad faith).
[10] *See, e.g. Easterling v. Collecto, Inc.*, 692 F.3d 229, 232 (2d Cir. 2012) (applying *Brunner*).

preponderance of the evidence for the court to discharge his student loans. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991).

In evaluating the prongs of the *Brunner* test, the court will accord due deference to this *pro se* Debtor. *See Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000).

### Discussion

***First Prong: Can the Debtor maintain, based on current income and expenses, a "minimal" standard of living if forced to repay the loans?***

In determining whether Debtor has satisfied the first prong of the *Brunner* test, the court must "examine whether the Debtor has demonstrated, based on his current income and expenses, that he cannot maintain a minimal standard of living for his family and repay the educational loans." *In re Wells*, 380 B.R. 652, 659 (Bankr. N.D.N.Y. 2007). The debtor "must demonstrate more than simply tight finances; the proper inquiry is whether it is unconscionable to require debtor to earn more income or reduce expenses" in order to repay the loans. *Id.* (internal citations omitted). Total household income, including from all members residing with Debtor, must be considered when addressing the first prong of *Brunner*. *Id.*

As a preliminary matter, Debtor has admitted that he has not considered an income-based repayment plan ("IBRP") that might lower his monthly student loan payments. U.S. Dep't of Ed. seizes upon this admission to argue that Debtor's failure to consider such option necessarily compels the conclusion that Debtor's payments of his student loans would allow him to preserve a "minimal" standard of living. Doc. 89 at p.7 citing *inter alia In re Cehula*, 327 B.R. 241, 248 (Bankr. W.D. Pa. 2005). The court rejects this argument. U.S. Dep't of Ed. fails to cite the line of cases that have found that failure to apply for income-based repayment options does not *per se*

preclude dischargeability.[11] The court agrees with the reasoning of these cases that to require a debtor to first consider income-based repayment plans would preclude a debtor from ever being able to satisfy a necessary prong of the *Brunner* standard.[12]

Turning to the analysis of Debtor's income and expenses, it is a close question whether Debtor satisfies the first *Brunner* prong. Among the cases construing the *Brunner* standard most generously is *In re Bene*, 474 B.R. 56 (Bankr. W.D.N.Y. 2012). In that case, the court posited that a debtor does not meet a minimal standard of living if income is less than twice the federal poverty level, after deducting the costs of servicing student loans.

The current federal poverty level is $12,490 for a family of one and $16,910 for a family of two.[13] Doubling the federal poverty guidelines, it would be $24,980 for a family of one and $33,820 for a family of two. At the time of trial, Debtor was receiving New York State unemployment benefits, which have since expired. The combined household income for Debtor and his girlfriend is, therefore, only $20,240, well below twice the federal poverty guidelines.

The court must also consider the expense side of Debtor's financial situation and what ongoing collection activities would mean in the repayment of the loans. The court estimates, with compounding interest, Debtor's total current student loan debt to be $110,000 to $120,000. With Debtor's financial expenses currently at $1,000 for rent, $300 for phone and internet and $500 for food, it is unlikely that Debtor could substantially lower his expenses.

---

[11] *See, e.g. Educ. Credit Mgmt. Corp. v. Curiston*, 351 B.R. 22, 33 (D. Conn. 2006) (citing *In re Rutherford*, 317 B.R. 865, 880-81 (Bankr. N.D. Ala. 2004) (analyzing income-based repayment in the good faith context)); *see also In re Bene*, 474 B.R. 56 (Bankr. W.D.N.Y. 2012) (discharging student loans despite Debtor's failure to consider income-based repayment).

[12] Furthermore, the government's approach overlooks the essential quandary that at the end of the required IBRP payback period, the balance of the loan, when forgiven, would result in a hefty income tax liability, which would not be the case were the debt discharged in bankruptcy.

[13] 84 C.F.R. § 1167 at 1167-68 (2019)

Based solely on Debtor's *current* income and expenses, the court finds that Debtor's budget could not absorb repayment of a $110,000 debt and still provide him with a minimal standard of living. Accordingly, the court concludes that Debtor has met his burden as to the first prong of the *Brunner* test.

***Second Prong: Do additional circumstances exist to indicate that Debtor's state of affairs is likely to persist for a significant portion of the repayment period of the student loans?***

This court has noted that, unlike the first prong of *Brunner*, which focuses on current income, "[t]his second prong of the Brunner test is forward-looking and requires that Debtor prove not only that he is presently unable to pay his Student Loans, but that his 'current financial hardship is likely to be long-term.'" *In re Gleason*, 2017 WL 4508844, at *4 (Bankr. N.D.N.Y. Oct. 6, 2017). In addition, "[m]ere inconvenience, austere budget, financial difficulty and inadequate present employment," are insufficient grounds for discharging debts pursuant to section 523(a)(8). *In re Wetzel,* 213 B.R. 220, 225 (Bankr. N.D.N.Y. 1996). Instead, Debtor must show "additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time." *Brunner* 831 F.2d at 396. To determine whether these circumstances exist, courts must consider "assets, career, income or potential for increased career or financial opportunities . . ." *In re Davis*, 373 B.R. 241, 249 (W.D.N.Y. 2007). Courts generally consider pensions and Social Security payments in this calculation. *See, e.g. In re Santamassino*, 373 B.R. 807, 812 (Bankr. D. Vt. 2007) (finding that a debtor who was providing 24 hour per day care to her mother with Parkinson's disease and subsisting only on her mother's Social Security and pension met the second prong of the *Brunner* test).

While Debtor established that he is currently unemployed, he did not establish that he is unemployable or that there is a certitude that he will be unable to pay his debts in the future. Debtor testified that he was scheduled to interview for the position of director of veterans' affairs for

Tompkins County, which pays $72,000 per year. Hr'g Tr. p. 33 at 9-12. Regardless of the outcome of that interview, Debtor is seeking employment and fully able to work. Debtor has a diagnosis of a 10% disability for tinnitus which does not preclude nor prevent long-term employment. Nor was any medical evidence introduced to establish that any of Debtor's prior, short-term disabilities prevent him from working.[15]

In addition to employment prospects, in March 2020, Debtor will be entitled to his $2,200 per month military pension and will be eligible for Social Security at the age of 62. The additional income must be considered when determining whether Debtor's current state of affairs is likely to persist. The military pension will bring Debtor and his girlfriend's combined annual income to $46,640. Given his background and experience, Debtor is likely to secure a job that will at least meet if not exceed the amount of his previous unemployment payments. From the evidence, it is clear that Debtor's total income will only increase.

The court finds that Debtor has failed to meet his burden to show that his current state of affairs is likely to persist into the future such that, if the loans are held to be nondischargeable, he would not be able to maintain a minimal standard of living.

***Third Prong: Has the Debtor made good faith efforts to repay the loans?***

The term "good faith" has particular resonance for Debtor, because, as he testified, he was very upset at the State's continued insistence that he show a sign of good faith before they would release his degree. Hr'g Tr. p. 37 at 4-10. Debtor believes that his military service was a sufficient emblem of his good faith. Hr'g Tr. p. 37 at 10-12 The court appreciates Debtor's service to our nation. However, in the context of a *Brunner* analysis, the term "good faith" does not entail a

---

[15] *Compare, e.g. In re Porazzo*, 307 B.R. 345, 350 (Bankr. D. Conn. 2004) (finding a debtor eligible for student loan discharge where a clinical psychologist testified that debtor was permanently unemployable due to autism, with the condition anticipated to persist into the future).

judgment as to Debtor's moral character. "Good faith" is a term of art that has a specific legal meaning. In this context, the court must interpret "good faith" as Debtor's efforts to repay his student loans as interpreted within the current jurisprudence. *See, e.g.*, *In re Kelly*, 351 B.R. 45, 54 (Bankr. E.D.N.Y. 2006).

The good faith prong requires that Debtor's "condition must result from factors beyond [his] reasonable control." *Id.* (internal citations omitted). There were elective choices that the Debtor made during his youth that placed him in a precarious financial position early on. By his mid-twenties, he had four dependents under the age of five and was financially responsible for their support and that of their mother who was then living apart in a separate household. Debtor testified that, as a result, he did not pay his student loans because of the support payments that he was obligated to make. However, a debtor cannot accumulate arrears by failing to fulfill domestic support obligations and then attempt to use that financial burden to justify discharging student loans. Debtor may have hoped for a different outcome, but he did earn and has a college degree.[16] Debtor has declined, however, to make a single voluntary payment on any of his student loans even when he had discretionary funds available. Instead, Debtor chose to spend down $10,000 from his 401(k) retirement account to cover purchases of a personal nature which included a motorcycle and various musical instruments, and no portion of this amount was applied to pay his student loans. Hr'g Tr. p. 56 at 14-25; p. 57 at 1-14. While the court understands Debtor's need for transportation, Debtor had an additional $7,000. The motorcycle only cost a "couple thousand dollars" and the musical instruments were not more than $1,000. Yet, not one penny of this was paid on his student loan debt. Thus, when Debtor had discretionary funds, he did not demonstrate

---

[16] It is not clear from the record which portion of Debtor's student loans are due to his undergraduate studies and which arose from his graduate studies.

14

the required good faith effort to repay the loans. Debtor could have exhibited good faith effort by directing at least some of this money, even a nominal amount, toward paying down his student loans but chose not to do so.

Some courts have found that "the 'good-faith effort' prong of the *Brunner* test does not require a history of repayment, so much as a history of genuine effort to repay, considering all the circumstances." *In re Grubin*, 476 B.R. 699, 712-13 (Bankr. E.D.N.Y. 2012). Here, other than garnished payments, Debtor has made no effort to repay his loans. Courts infer from such failure a lack of good faith effort to pay the student loans. *See, e.g. In re Davis*, 526 B.R. 136, 141-42 (Bankr. W.D. Pa. 2015).

The U.S. Dep't of Ed. aptly noted that the policy goal of protecting the financial integrity of the student loan system is "accomplished by reducing bankruptcy defaults thereby assuring a continued recycling of funds for future low interest rate loans for students." *In re Thoms*, 257 B.R. 144, 147-48 (Bankr. S.D.N.Y. 2001). Under the circumstances presented, to find that Debtor acted in good faith when he never made a voluntary payment on his student loans would clearly serve to undermine the policy of protecting the financial integrity of the system for would-be future loan recipients. Based on the foregoing, the court finds that Debtor has failed to meet the third prong of the *Brunner* test.

**Conclusion**

At the close of Debtor presenting his case, Defendants moved to dismiss the Complaint. The court deferred decision on the motion and allowed Defendants' case to proceed. Based upon a review of the entire record, the court finds that Debtor has failed to carry his burden to establish each prong of the *Brunner* test to qualify for discharge of his student loans under 11 U.S.C. § 523(a)(8). While this result may appear harsh to Debtor, this court is bound by longstanding

precedent. Absent Congressional legislation which would change the standard for discharging student loans, this is the only appropriate outcome under current law. Accordingly a separate judgment shall issue dismissing the Complaint.

So Ordered.

Dated: August 13, 2019
Syracuse, New York

/s/ Margaret Cangilos-Ruiz
Margaret Cangilos-Ruiz
United States Bankruptcy Judge